Vanessa R. Waldref
United States Attorney
Eastern District of Washington
George J.C. Jacobs III
Assistant United States Attorney
Post Office Box 1494
Spokane, WA 99210-1494
Telephone: (509) 353-2767

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>RHONDA S. ACKERMAN,<br><br>Defendant. | 2:22-CR-00022-RMP<br><br>United States Corrected Sentencing Memorandum |

Plaintiff, United States of America, by and through Vanessa R. Waldref, United States Attorney, for the Eastern District of Washington, and George J.C. Jacobs III, Assistant United States Attorney for the Eastern District of Washington, submits the following United States corrected sentencing memorandum.[1]

In 2015, 2016 and 2017, Defendant engaged in a scheme through which she embezzled $440,315.25 from Spokane County Department of Risk Management and failed to file federal income tax returns reporting her income. According to the IRS Criminal Investigation Special Agent who investigated the criminal tax case,

> Ackerman used nominees to cash fraudulently received voucher checks and give her the cash in an attempt to conceal her income. All documents and transactions were conducted in the nominees' names. Ackerman dealt with large amounts of cash. It cannot be stated with absolute certainty what the proceeds were spent

---

[1] There was a typographical error on line 5, page 2 of ECF No. 61. Therefore, the government is filing this corrected sentencing memorandum.

United States Sentencing Memorandum- 1

on. A review of Ackerman's bank statements showed that Ackerman deposited some of the proceeds into her bank account and it appears many of the transactions were used for every day living expenses. A large portion of the cash Ackerman received was spent gambling. Ackerman withdrew approximately $117,000 at Northern Quest Casino.

Defendant abused her position as a liability claims technician and used her access to risk management software to enrich herself by: (1) creating bogus "vendor" and vendor IDs" for multiple nominees, (2) creating and submitting bogus liability claims vouchers to Spokane County, (3) cunningly waiting for the Director of Risk Management to be out of the office at which time she would seek approval of the fraudulent vouchers from the director's backup, (4) delivering the bogus vouchers to the auditor's office for payment and had the vouchers held there for her to pick up, (5) picking up the vouchers and contacting the nominee to have them cash the checks at local banks, (6) paying each nominee between $100 and $600 for cashing the checks, and (7) keeping the remaining amount for her own personal use and benefit. The investigation revealed that Spokane County approved disbursement payments as a result of fictitious third-party claims Defendant had processed on behalf of 45 individuals through the auditor's office and Department of Risk Management. Between 2007 and 2016, her scheme resulted in the theft or embezzlement of $1,378,541 from Spokane County.

The government respectfully requests that Defendant be sentenced to 24 months' incarceration (to run concurrent to her state sentence),[2] one year of supervised release, and restitution in the amount of $96,363.00. Such a sentence is warranted based upon Defendant's extended criminal activity, her history and characteristics, and the need to

---

[2] In Spokane County Superior Court (22-1-10632-32), Ackerman pleaded guilty to Theft in the First Degree for stealing $1,378,541 from Spokane County while working as a liability claims technician between 2007 and 2016. She was sentenced to serve a prison term of 1 year and one day and to repay that amount in restitution.

United States Sentencing Memorandum- 2

avoid sentencing disparities between such white-collar defendants and others in the criminal justice system.

On February 7, 2023, Defendant pleaded guilty to Counts 1 and 2 of the Indictment, which charged her with willfully failing to file federal income tax returns for the 2015 and 2016 calendar years, in violation of 26 U.S.C. § 7203. ECF No. 51.

**Calculation of Tax Loss**

While the parties did not agree to a specific tax loss in the plea agreement, Defendant acknowledged that the government would recommend Defendant's Base Offense Level is 14, based on a tax loss of more than $40,000 but less than $100,000. ECF No. 51, ¶ 7(a). Regarding restitution, Defendant agreed she owes restitution in the amount of $96,363.[3] ECF No. 51, ¶ 11.

The Sentencing Guidelines and controlling case law make clear that tax loss for Guidelines purposes is not limited to the tax loss charged but includes the tax losses resulting from the relevant pattern of conduct, which includes uncharged conduct that was part of the same scheme. *See* USSG §2T1.1 comment, (n.2) ("In determining the total tax loss attributable to the offense (see § 1B1.3(a)(2)), all conduct violating the tax laws should be considered as part of the same course of conduct or common scheme or plan unless the evidence demonstrates that the conduct is clearly unrelated."). Here, the tax losses flowing from this course of conduct include Defendant's failure to file tax returns and report to the IRS taxable income of $272,837.32 in 2014, $220,162.70 in

---

[3] The government notes that it made a computational error in the plea agreement. According to IRS Criminal, the correct amount is $125,256.12. On April 7, 2023, the government notified defense counsel and the Probation Office of its computational error.

United States Sentencing Memorandum- 3

2015 and $154,020.01 in 2016. According to IRS Criminal Investigation, Defendant's tax due and owing is $125,256.25.[4]

### Enhancement for Income from Criminal Activity USSG §2T1.1(b)(1)

Pursuant to USSG §2T1.1(b), Defendant's offense level is increased two-levels because she failed to report income exceeding $10,000 in any year from criminal activity. Of the income that Defendant did not report, far more than $10,000 was income from criminal activity each year, specifically Theft in the First Degree or embezzlement of monies totaling $212,129.92 in 2014, $147,966.68 in 2015 and $80,218.65 in 2016. Application Note 4 provides that "criminal activity" means "any conduct constituting a criminal offense under federal, state, local or foreign law." *Id.* Defendant's Theft in the First Degree is at a minimum a state crime. *See, e.g.*, RCW 9A.56.030. Moreover, the evidence gathered in the investigation amply demonstrated Defendant tried to conceal her theft from Spokane County by creating fictitious third-party claims and using others in her scheme.

### Application of Guidelines and Section 3553(a) Factors

Pursuant to the plea agreement, the government recommends Defendant's base offense level is 14, based on a tax loss of over $40,000 but less than $100,000. It also recommends a two-level increase because Defendant failed to report income exceeding $10,000 in any year from criminal activity. After timely acceptance of responsibility, Defendant's total offense level would be 13.[5] Based on CHC IV, her advisory guidelines sentencing range is 24-30 months.

---

[4] A tax loss of $125,256.25 increases the base offense level from a 14 to a 16. USSG §2T4.1(F).

[5] Unless Defendant agrees to a written modification of the plea agreement, the government is bound by its terms; therefore, it is recommending a total offense level of

United States Sentencing Memorandum- 4

**Nature, Circumstances, and Seriousness of the Offenses**

The nature and circumstances of the offense demonstrate the defendant's clear criminal intent to engage in an extensive theft scheme. Ackerman's theft of over $400,000 from Spokane County was not a one-time act that might be attributable to a singular breach of the trust placed in her by her employer. On the contrary, it was a multi-year scheme in which Defendant stole money from Spokane County. She had ample opportunity to reflect on the wrongfulness of her course of conduct, and rather than put an end to her scheme, she chose to continue unlawfully enriching herself. Time after time, check after check, transaction after transaction, Defendant knew that what she was doing was wrong, and that it was a crime.

Compounding the seriousness of the conduct is the manner in which Defendant attempted to conceal her scheme. Rather than bear the burden of her fraudulent conduct alone, Ackerman enlisted others, fabricating vouchers, and otherwise attempting to avoid detection through deception and fraud.

The circumstances of the offense also evidence the absence of any mitigating circumstances. Defendant did not steal the money out of selfless concerns, imminent needs, or the inability to earn the money through legitimate means. Indeed, she was gainfully employed as a liability claims technician.

Defendant's crime falls squarely within the class of cases to which the applicable Guidelines are addressed. Thus, consideration of the nature and circumstances of the offense favors a sentence within the advisory Guidelines range. Because the nature and circumstances of this offense also reflect blatant, repetitive, and persistent criminal behavior, this factor suggests that a sentence of incarceration is appropriate.

**History and Characteristics of Defendant**

---

13 (based on a tax loss of $96,363), rather than a total offense level of 15 (based on a tax loss of $125,256.12) as correctly calculated by the Probation Office.

United States Sentencing Memorandum- 5

Defendant's conduct not only included three years of tax crimes, but also years of other crimes and misconduct. PSR, ¶ 41, 44. The tax crimes were part and parcel of thefts from Defendant's employer – ongoing for many years. Defendant willfully disregarded the tax laws, embezzled county funds for her own personal use and benefit and used nominees to further her scheme.

**Need to Promote Respect for the Law and Just Punishment**

The criminal tax laws are designed to protect the integrity of the nation's tax system, which is dependent upon a system of voluntary compliance. The tax laws of our country, in effect, reflect an honor system under which citizens are required to cooperate with the government. It is vital that when a citizen is non-compliant, that citizen is appropriately punished. *See United States v. Zukerman,* 897 F.3d 423, 427 (2d Cir. 2018) (explaining that "'tax crimes represent an especially damaging category of criminal offenses,' which 'strike at the foundation of functioning government'") (citations omitted).

Failure to sentence Defendant to a term of incarceration would send the wrong message – the message "that would-be white-collar criminals stand to lose little more than a portion of their ill- gotten gains and practically none of their liberty." *United States v. Martin,* 455 F.3d 1227, 1240 (11th Cir. 2006). It is important both to "the deterrence of white-collar crime (of central concern to Congress), and "the minimization of discrepancies between white- and blue-collar offenses, and limits on the ability of those with money or earning potential to buy their way out of jail." *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (cited and quoted with approval in *United States v. Levinson*, 543 F.3d 190, 197 (3d Cir. 2008) (noting that "probationary sentences for white-collar crime raise concerns of sentencing disparities according to socio-economic class."). A term of incarceration at the low-end of the Guidelines is required to promote respect for the law and provide just punishment for this Defendant in this case.

**Need to Afford Adequate Deterrence**

United States Sentencing Memorandum- 6

The Sentencing Guidelines provide that deterrence should be the primary consideration when sentencing defendants for tax crimes. Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is of the utmost importance when punishing criminal tax violations. USSG § 2T1, introductory cmt. (2016). Here, Defendant's willful refusal to pay her fair share, along with her continued conduct, demonstrate that both specific and general deterrence are necessary.

General deterrence through serious sentences for criminal tax fraud is an essential means of minimizing the ever-increasing amount of money estimated to be lost each year through tax fraud. An IRS study of tax compliance estimates that only 83.1% of individuals are compliant, leaving a yearly tax gap of over $458 billion dollars in unreported and uncollected taxes. *See* "Tax Gap Estimates for Tax Years 2008-2010," April 2016 (Att. O). Hundreds of billions of dollars are lost annually because people like Defendant shirk their responsibilities as American taxpayers.

Widespread noncompliance with the tax laws is thus an important consideration when sentencing for tax offenses. Meaningful sentences that through their terms speak loudly are necessary to deter such conduct. Absent such deterrence, others with the means and opportunity to enrich themselves at the cost of other taxpayers will cynically conclude that the potential rewards of such criminal activity outweigh the risks of being caught and punished. The sentence in this case should send a strong message to would-be tax cheats that a term of imprisonment is a reality for willfully failing to file tax returns and report income. The sentence should also assure law-abiding taxpayers that they are not foolish for paying their fair share of taxes.

Our tax system depends on the voluntary compliance of honest taxpayers. A sentence of imprisonment promotes voluntary compliance by making clear that there are consequences for hiding income from the government. Sentencing Defendant to a term of incarceration at the low-end of the Guidelines provide will convey the message

United States Sentencing Memorandum- 7

to others that systematic and willful failure to file returns and report income will be met with strong punishment.

**The Need to Avoid Unwarranted Sentencing Disparity**

The legislative history of the Sentencing Reform Act of 1984, which created the United States Sentencing Commission, made clear that one of the Act's goals was to rectify the serious problem in the criminal justice system that white-collar offenders were not being adequately punished. *See* S. Rep. No. 98-225, at 77 (1983) ("[S]ome major offenders, particularly white-collar offenders … frequently do not receive sentences that reflect the seriousness of their offenses."). Then-Judge Breyer, an original member of the Sentencing Commission, explained:

> The Commission found in its data significant discrepancies between pre-Guideline punishment of certain white-collar crimes, such as fraud, and other similar common law crimes, such as theft. The Commission's statistics indicated that where white collar fraud was involved, courts granted probation to offenders more frequently than in situations involving analogous common law crimes; furthermore, prison terms were less severe for white-collar criminals who did not receive probation. To mitigate the inequities of these discrepancies, the Commission decided to require short but certain terms of confinement for many white collar offenders, including tax, insider trading, and antitrust offenders, who previously would have likely received only probation.

*See* Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 Hofstra L. Rev. 1, 20-21 (1988). In considering the issue of unwarranted disparities in sentences, the Court should consider the need to avoid sentencing disparities between this crime and other crimes motivated by the desire to obtain money –not just disparities between this tax crime and other tax crimes, but also disparities between this crime and drug crimes, for instance. The need to avoid disparities between such crimes and the gulf between white collar sentences and non-white collar sentences calls strongly for a sentence of incarceration here where a county employee choose for many years to deliberately flout the tax law and steal from the county.

United States Sentencing Memorandum- 8

**Conclusion**

The government respectfully submits that a sentence at the low-end of the advisory Guidelines is sufficient, but not greater than necessary, to achieve the purposes set forth in 18 U.S.C. § 3553.

Dated: May 17, 2023.

Vanessa R. Waldref
United States Attorney

*s/ George J.C. Jacobs III*
George J.C. Jacbos III
Assistant United States Attorney

**CERTIFICATE OF SERVICE**

I hereby certify that on May 17, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the counsel of record.

*s/George J.C. Jacobs III*
George J.C. Jacobs III
Assistant United States Attorney

United States Sentencing Memorandum- 9